Gary Lee **WIXON**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

, No. F–74–368.

Court of Criminal Appeals of Oklahoma.

Oct. 7, 1974.

Rehearing Denied Oct. 31, 1974.

James E. Frasier, David C. Cohernour, Legal Intern, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Jeanette Haag, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Gary Lee Wixon, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–73–1408, for the offense of Unlawful Delivery of Marijuana in violation of 63 O.S., § 2–401(B)(2). His punishment was fixed at a term of six (6) years' imprisonment and a fine of Thirteen Hundred ($1,300.00) dollars, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Robert Boston testified that he was employed by the Tulsa Police Department. In August of 1973, he was assigned to the Narcotics Division as an undercover agent. At approximately 10:00 a.m. on August 2, 1973, he and Special Agent Ed Alcorn went to the Colony Club Apartment complex, apartment 201, at 7605 East 21st in Tulsa, Oklahoma. He testified that he had made an appointment with a person by telephone to buy some marijuana there. (Tr. 10) Officer Boston knocked on the apartment door and the defendant came to the door and asked them to come in. He further testified that after entering the apartment he and Agent Alcorn engaged in some preliminary small talk with the defendant concerning the Watergate Hearings on television. Shortly thereafter, a transaction was consummated where the defendant turned over ten pounds of marijuana for $1,300.00 in cash, which was provided by Agent Alcorn. As the defendant reached for the money, Officer Boston showed him his badge and identified himself and Agent Alcorn and told him he was under arrest and informed him of his Miranda rights which defendant acknowledged he understood. Officer Boston also identified State's exhibits Nos. 1 through 10 as being the ten pounds of marijuana confiscated from the defendant.

On cross-examination, Officer Boston testified that he had received a call from an Officer Coleman at approximately 7:30 a.m. (Tr. 25–26) Coleman gave Boston a telephone number to call at apartment 201. (Tr. 25) He placed a call to this number and arranged to purchase some marijuana at 10:00 a.m. that same morning. Boston further testified that he had been to that apartment previously and he knew that the only residents in apartment 201 were Ben Cato and George Durant. (Tr. 26–27)

Finally, on redirect Boston testified that only he, Agent Alcorn and the defendant were present in the apartment at the time of the transaction.

Special Agent Alcorn was called as the next witness for the State. Agent Alcorn identified State's exhibits Nos. 1 through 10 as being the ten pounds of marijuana confiscated from the defendant. He testified that he had never been to apartment 201 and did not know who lived there. The remainder of Agent Alcorn's testimony basically corroborated Officer Boston's testimony for the period between 9:00 a.m. to 9:30 a.m., August 2, 1973, when the two officers met until after the arrest was accomplished. (Tr. 46)

Forensic chemist Ken Williamson was the final witness for the State during their case-in-chief. After being duly qualified as an expert, he testifed that the substance confiscated by Boston and Alcorn in their arrest of the defendant was marijuana. He further testified as to the types of tests he had performed and the safeguard procedures the property room follows to protect evidence. That concluded the State's case-in-chief.

The defendant presented two witnesses in his behalf. They were George Durant, one of the two actual residents of apartment 201, and the defendant himself. Durant testified that he had known Ben Cato, the other resident of the apartment, for about eight or nine years. (Tr. 67). The defendant then attempted to show that Ben Cato was an informer/agent for the

police who had entrapped the defendant into committing this crime.

"Q. Did you, sir, live in Apartment 201?

"A. Yes, sir.

"Q. All right, sir. With whom did you live?

"A. Ben Cato, my roommate.

"Q. All right, sir. Now, Mr. Durant, of your own personal knowledge, do you know if Ben Cato caused Gary Lee Wixon to be arrested?

"A. Yes, sir.

"MR. ROBERTSON: Object to the form of the question.

"THE COURT: Overruled. Exception allowed.

"Q. You do know that?

"A. Yes, sir.

"Q. How do you know that?

"A. Cato told me." (Tr. 67–68)

That concluded the substantive portion of Durant's testimony.

The defendant testified that he arrived at Cato's apartment at about 7:00 a.m. on August 2, to say goodby, as he had a job in Wichita. (Tr. 75) When Cato heard that the defendant was leaving, "he acted like it was the end of the world." (Tr. 77) Cato then asked, as he had for at least three days in a row, if the defendant could get any "pounds" of marijuana that he (Cato) could sell. (Tr. 77). The defendant said he might be able to obtain some. He made a phone call and located ten pounds of marijuana. Subsequently, Cato engaged in two conversations by phone in which a deal was consummated to come to apartment 201 to pick up the marijuana. During these calls defendant spoke only to the person from whom he was getting the marijuana. (Tr. 88) The defendant further testified that when he returned to Cato's apartment with the marijuana, the apartment was empty. Cato had, however, promised that his brother would come

over and sell the marijuana. (Tr. 80–81) Cato's brother never showed up and the next people who came by were the narcotics officers. (Tr. 82) The defendant's testimony about the actual occurrences during the arrest is basically the same as the State's evidence tended to show, differing slightly concerning the administration of his Miranda warnings after arrest; and a denial of having said anything about the quality of the marijuana after the arrest was made. (Tr. 85, 92)

The final evidence by the defense was a reading into the record so that the trial court could take judicial notice of the criminal record of Ben Cato. That record showed two convictions; one for breaking and entering and the other for possession of marijuana.

The final presentation of evidence and testimony was rebuttal testimony by Officer Boston. Boston testified that he talked with two people at apartment 201, but he did not know the identity of the second party. (Tr. 96, 100) Boston further testified that the defendant appeared anxious once he saw the money (Tr. 103) On cross-examination, Boston admitted that he was not surprised that Cato was not in his apartment. (Tr. 103–104)

■ The defendant argues that the State failed to rebut the defense of entrapment beyond a reasonable doubt by the production of clear, substantial and nonprejudicial evidence and therefore the trial court erred in not ruling that the defendant was entrapped as a matter of law.

We need only observe that the trial court instructed the jury on the defense of entrapment. In Kite v. State, Okl.Cr., 490 P.2d 1402 (1971), we cited with approval the case of Riddle v. State, Okl.Cr., 373 P. 2d 832 (1962), wherein we stated:

"'Whether a defendant has been entrapped is to be determined by the jury, unless it can be decided as a question of law upon undisputed facts sufficient to to (sic) establish entrapment.'"

See Kissick v. State, Okl.Cr., 504 P.2d 889 (1973). In the instant case, entrapment could not be decided as a question of law upon sufficient undisputed facts and the question was, therefore, properly submitted to the jury who chose not to believe the defendant's testimony.

The defendant's next assignment of error alleges that the instructions given by the trial court were inadequate and erroneous in that they failed to clearly instruct the jury that the burden of proof rests upon the State to prove beyond a reasonable doubt that the defense of entrapment did not occur. In particular, the defendant contends that the trial court erred when it failed to give an instruction on the elements of entrapment requested by the defendant. Defendant's requested instruction is as follows:

> "Entrapment is the conception and planning of an offense by an officer, or his agent under his direction, and his procurement of its commission by one who would not have perpetrated it except for the trickery of the officer."

With this contention we cannot agree, for in reading all of the court's instructions, it becomes apparent that the relevant law was completely and accurately stated. We feel that Instruction No. 7, given by the court, covers defendant's requested instruction above, which reads as follows:

> "The defendant, as one of his defenses herein, has pled entrapment. In this connection you are instructed that one who is instigated, induced, or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime which he had otherwise no intention of committing may avail himself of the defense of 'entrapment'. Therefore, if you find the defendant was induced or lured by an officer of the law or other person for the purpose of prosecution, into the commission of a crime which he had otherwise

no intention of committing, then in that event, it will be your duty to hold for the defendant and acquit him. Such defense is not available, however, where the officer or other person acted in good faith for the purpose of discovering or detecting a crime and merely furnished the opportunity for the commission thereof by one who had the requisite criminal intent.

> "Accordingly, entrapment is not available as a defense to a person who has the intent and design to commit a criminal offense and who in fact does commit the essential acts constituting it, merely because an officer of the law, in his effort to secure evidence against such person, affords him an opportunity to commit the criminal act, or purposely places facilities in his way or aids and encourages him in the perpetration thereof, particularly or at least where the doing of the particular act is a crime regardless of the consent of anyone. However, the officers cannot employ extraordinary temptations or inducement to commit the crime.

> "The principle of entrapment places no limitation on the right of officers to obtain evidence of any crime originating in the mind of another. He is not required to advise the defendant at the time of the commission of the alleged offense that he is an undercover agent, nor is he required to tell the defendant that if defendant does sell him Marijuana, the facts leading up to the sale and the sale itself will be used against him in a court of law; nor is he required to make an immediate arrest, particularly if such an arrest would end a continuing undercover investigation, but a charge may be filed and an arrest made at the end of the undercover investigation."

This instruction, when taken together with the other instructions, correctly advised the jury as to the law applicable in the instant case.

In Cawley v. State, 96 Okl.Cr. 53, 248 P.2d 273 (1952), where a larceny conviction was upheld, this Court held:

"It is axiomatic that instructions must be considered as a whole, and when so considered together, if they fairly and correctly state the law applicable to the case they will be sufficient. Lamb v. State, 70 Okl.Cr. 236, 105 P.2d 799.

\* \* \* \* \* \*

"It has been repeatedly held that it is not error to refuse requested instructions which are proper statements of law when such requested instructions are substantially covered by the instructions given by the court." 248 P.2d at page 280.

See, Owens v. State, Okl.Cr., 438 P.2d 21 (1968)

█ The defendant's final assignment of error alleges that the highly prejudicial acts of the Assistant District Attorney denied the defendant of his right to a fair and impartial trial. It is insisted by counsel for the defendant that the conduct and argument complained of is so serious and such a deprivation of defendant's rights that the case should be reversed and remanded for a new trial. With this contention, we do not agree.

After careful examination of the record we do find the argument was improper and, because of its impropriety, it had the effect of the jury's assessing more punishment than they probably would have assessed if the improper argument had not been made. However, when it is considered that, in the instant case, the evidence of the defendant's guilt is overwhelming, we think the ends of justice would best be served by modifying the sentence imposed upon defendant.

It is, therefore, ordered that the judgment and sentence of the District Court, Tulsa County be modified by reducing the judgment and sentence from six (6) years' imprisonment and a fine of Thirteen Hundred ($1,300.00) dollars to five (5) years' imprisonment and a fine of Thirteen Hundred ($1,300.00) dollars, and as so modified affirmed.

The judgment and sentence of the District Court, Tulsa County, as thus modified is affirmed.

BLISS, P. J., concurs.

BRETT, J., dissents.

BRETT, Judge, (dissenting).

I respectfully dissent to the results reached in this decision. I believe that the impropriety of the remarks of the prosecutor when considered in reference to the evidence presented at trial is sufficient to necessitate the reversal of this case. As I compare the testimony actually given with what the prosecutor related to the jury during his argument, I find that there were sufficient misstatements of testimony to cause fundamental error.

This Court, speaking through Judge Jones, stated in Rheuark v. State, 81 Okl. Cr. 60, 160 P.2d 413, 414, (1945), citing Hill v. State, 76 Okl.Cr. 371, 137 P.2d 261 (1943):

"A prosecuting attorney should confine his argument before the jury to a fair discussion of the issues in the case, and improper remarks objected to at the time will be considered and construed in reference to the evidence. If it appears that the improper argument may have determined the verdict, the judgment will be reversed." See also: Dupree v. State, Okl.Cr., 514 P.2d 425 (1973).

The majority opinion correctly states that the State's argument was improper. After considering the evidence, I am unable to say that the improper argument, which included constant filling in of gaps in the state's evidence, did not affect the determination of the verdict. That the prosecutor's remarks were highly prejudicial is reflected by the sentence imposed by the jury, the prosecutor recommended a sentence of five (5) years imprisonment, but the jury returned a sentence of six (6) years, coupled with the fine assessed.

It is true as the majority opinion states that the issue of entrapment in this case was properly one for the jury. Nonetheless, it is my opinion that the totality of the evidence raises sufficient doubt to warrant a new trial in view of the fact that this issue was considered by a jury which had been subjected to a highly prejudicial argument.